All right, we're ready for the next case, Mississippi Silicon Holdings versus Axis Insurance. We'll first hear from Mr. Given. Yes, my place of court, Robert Given here for Appellant Mississippi Silicon. Your Honor, this case involves a fraudulent scheme carried out against my client Mississippi Silicon by some very sophisticated fraudsters who were able to the Mississippi Silicon computer system that ultimately that caused Mississippi Silicon to transfer funds to these fraudsters to an account and to fraudsters that they had no knowledge or consent that they were doing. You said they entered false information into your client's computer system. Correct. Did they just I mean, just by having the email, the fake email that misidentified the source that sending the email into your system? Is that the false entry into your system? Yes. The policy line, which says that computer transfer fraud is when the insurer will pay for loss resulting directly from computer transfer fraud, which is defined as the fraudulent entry of information into or the fraudulent alteration of any information within a computer system. So you're saying receiving an email is fraudulently entering information into this? Yes. Fraudulent, the reasonable meaning of the word would be deceitful or deceitful entry. These fraudsters were. I know it's fraud. You don't have to convince me that it's the entry. Let me give you a hypothetical. Okay. Someone emails Mississippi Silicon. Let's say they have a person in charge of charitable giving or community affairs. And someone emails and says, I'm from the Red Cross. There's been a hurricane. Please, your company, please donate to disaster relief. And here's where you should send the money. And the person gets it and says, oh, we want to be a good corporate citizen. Here's a thousand dollars. We're going to send to the Red Cross. Turns out this this is not the Red Cross. Would you say that's that's covered? That's a fraudulent entry of information into your client's computer system? Deceitful entry is information that is intended to deceive, defraud and elicit an action from the recipient. And I think what is the entry of information? That's what I'm trying to figure out. I know there's fraud. Again, I know there's fraud there. Under my hypothetical, what information is being entered into this system? It is the email. It is the fraudulent. It is the email is being entered. That is the information that is being put into the computer system of Mississippi Silicon in this case. So so any time you're the victim of a fraud that results in an email going into your client's computer system, you're saying that the provision applies? It would have to be meet the remainder of the terms of the provision. Yes, that way it is worded and the way it is defined. The fraudulent entry of information in here. Also, these emails, the fraudsters would take existing emails and add to them, subtract from them, alter them. They would be part real emails, part fake. So they would be altered and put in, be put back within our system. What about the issue of the insured's knowledge of the fraud? Knowledge of the trend. Which of course, in reading the whole provision, it says interior paper loss of or loss from damage to cover property, which is money here, resulting directly from the fraudulent entry of information into or the fraudulent alteration of information within the computer system that causes the transfer of payment or delivery of the money from the premises or account to a person, place or account beyond the insured Mississippi Silicon's control without the insured entity's knowledge or consent. And your honor, I would say that here it was very clear that Mississippi Silicon did not have knowledge that they were sending this money to fraudsters. And although they knew there was a transfer being made, it was premised on fraud and they could not have the knowledge or consent that what they were doing was sending this money to fraudsters and there certainly was no evidence presented at the trial level that there was any knowledge or consent to this happening. Well, doesn't the insured's knowledge of the transfer as opposed to knowledge of the fraud? I think a reasonable reading of this provision does not say that there's knowledge or consent of a transfer. When read in full context, I think the reasonable reading is that just what happened here, this money was forwarded to fraudsters and a fraudster's account without the knowledge and consent of Mississippi Silicon that that was happening. I would say that under this policy, the district court primarily found in favor of accessing the Silicon based on what we say is an improper interpretation of the causation standard found in the phrase resulting directly from computer transfer fraud. The district court basically conceded that if a proximate call standard applied that this would be ambiguous and that would be found in Mississippi Silicon's favor. We have cited in our brief and there are cases in Mississippi which we believe Mississippi law would support the interpretation here of this phrase approximate call standard and some of those decisions are Dixie Pine Products versus Maryland Casualty, Providence Washington Insurance versus Weaver and there are several others where Mississippi Supreme Court has said that approximate calls reading would be made for this resulting directly from. Additionally, I think it's very significant in this phrase and you have seen it in the briefs that have been filed with the court and the district court's opinion. The resulting directly from language here applies to the loss and it says that the loss resulting directly from the fraudulent entry of information into a fraudulent alteration of information that causes. It doesn't say as we see in briefs that directly causes. The qualifying of direct here really goes to the loss. Many of the cases that are cited in the briefs where courts are saying direct means direct or referring to the loss itself. Is it a direct loss versus an indirect loss? Is it a loss that the insured entity suffered as opposed to a third party? The 11th circuit. How could counsel, how could resulting directly from refer to anything but the fraud? Well, in here, the fraudsters entered in deceitful information trying to acquire these funds and the clause calls for that if the loss results directly from that information coming into the phrase is met. And the law is replete with a lot of costly commas in contracts and insurance policies and tell me what, in your view, what work is the comma doing? That comma right before the knowledge and I believe that the knowledge or consent can be read to the antecedent phrase person, place, or account beyond the insurance control. Even if you look through the whole clause, I think it's still a reasonable reading here is just what happened in this case that the transfer was made without the knowledge or consent of Mississippi. So the transfer itself, they didn't know about. I mean, they're the ones who punched it. They're the ones who sent the instructions to send the bank transfer. Correct. But there have been many decisions cited in the briefs that say that the mere fact that they knew of a transfer does not mean that this knowledge that they had knowledge and consent of what was going on. I mean, as you interpret the knowledge and consent clause, are there, can you imagine any sort of set of facts where something would fall under and only under the social engineering clause and that would not fall under this clause in the computer transfer provision? Yes, your honor. The social engineering is very clear that it's reliance upon a telephone, written, or electronic instruction. So any fraudulent scheme involving the use of the telephone, calling, writing of letters, text. Wasn't this an electronic instruction? This was, but what I'm saying is social engineering would cover fraud for telephonic interaction that doesn't involve an electronic transfer, writings, and that would involve text, personal emails, several. There are many more things that could happen that would fall under social engineering. Well, can you imagine another electronic communication type situation that would fall only under the social engineering clause and not under the computer transfer clause? I'm just thinking. There, I'm just, I'm not coming up with a good example right at the moment, but clearly this policy also in the limits of insurance contemplated access contemplated that there could be coverages that were duplicative under more than one of the crime coverage parts and you would get the higher limit and obviously they expected that, knew that in drafting the policy and when you look. Let me ask you, if I can ask you counsel, we talked about the grammar with respect to this without the insurance knowledge or consent phrase and you're saying, well, you think you have a reasonable construction even if it could be read the other way too. How is yours reasonable? If you're saying what has to be without their knowledge is the fraud, I mean, if they knew it was fraudulent, they'd never send the money. So, what work are you no involvement of the insurance insiders in the fraudulent scheme? That's why it's placed. I think that's a reasonable reading and a reasonable interpretation for the insured and looking at this provision. This is the entity's knowledge, not some employees. I mean, I'm not sure a rogue employee would be, but anyway, if that's the importance you'd give is that it would apply to a situation where an insider was part of the fraud. Exactly, or knew about it or had some idea of what was going on. Getting back to the, really what was the thrust of the district court's opinion, the causation issue, bring to the court's attention that it's in the breeze, the principal solution case from the 11th circuit that dealt with a computer fraud very similar factually to this. There obviously were different definitions, but one of the big issues that the 11th circuit looked at was the resulting directly from and what that means as far as causation. Of course, it was under Georgia law, though, which is, I would argue, very similar to what Mississippi law would be. The 11th circuit said the ordinary meaning of the phrase resulting directly from requires proximate causation between covered event and the loss, not an immediate link. The court went on to say situating directly within the phrase resulting directly from reveals a different meaning when used with the preposition from resulting means to proceed, spring, or rise as consequence, effect, or conclusion. Results from imposes, in other words, a requirement of actual causality, and then it goes on to say, so reading the phrase resulting directly from as a whole requires us to find directly within the context of causation, and in that context, directly means proximately. It goes on to cite some black law dictionary phrases, and in that principal case, there was a fraudulent email that started the whole transaction. There were multiple steps before the transfer was ultimately made, but the court there, the 11th circuit said it's under the proximate cause standard. It was directly resulting from. All right, thank you. You saved time for rebuttal. I did. And we'll now hear Ms. Reed. Good afternoon, and may it please the court. I'm Tony Scott Reed, and I'm appearing today on behalf of Axis Insurance Company. This is a plain meaning case, and the plain meaning of the computer transfer fraud insuring agreement, which is a fully integrated provision, is the sole issue. The Northern District of Mississippi carefully and correctly analyzed this integrated provision, its words, its plain meaning, and its indisputable construction, and as a result, Judge Aycock correctly held that computer transfer fraud did not apply to the facts that are before the court. Axis today asked this court to affirm the district court's decision. To put this into a bit more context, your honors, I want to discuss just briefly the insurance policy overall. Mississippi Silicon selected and purchased an insurance policy that protects it against three distinct types of cybercrime by way of three distinct insuring agreements. Now, what are the cybercrime activities that are addressed? Well, there are three types of social engineering, funds transfer, and computer transfer, and we look to the policy to get the specifics, but these are distinct insuring agreements, and as the court has pointed out in prior questions, they define the covered hazards differently, and in fact, where one requires the knowledge and consent and involvement of the insured, the other two prohibit it. So, social engineering provides coverage when Mississippi Silicon's human employee is tricked into transferring Mississippi Silicon's money. Funds transfer fraud provides coverage when Mississippi Silicon's bank is tricked into transferring Mississippi Silicon's money, and finally, computer transfer fraud provides coverage when Mississippi Silicon's computer is tricked into transferring Mississippi Silicon's money, and the computer transfer moniker which appears both in the insuring agreement title and in the insuring agreement language is essential. There has to be a computer transfer, and that's one of the things that distinguishes it from the transfer. What we have here in the record is the evidence that Mississippi Silicon's human employee, John Lally, was tricked into transferring money to a fraudster who was pretending to be a vendor in an email communication with Mr. Lally. Now, the social engineering fraud insuring agreement provides coverage for that type of loss because the loss resulted directly from an employee acting in good faith based upon an electronic instruction that purported to be from a vendor, but turned out not to be. In short, the human being was tricked into acting. Now, the facts that are set out in the record illustrate that this is an absolutely classic social engineering scheme. So, first, the fraudster sends an email on October 23rd to Mr. Lally pretending to be a and thinks about the email. Later, Mr. Lally, using other information he independently had about materials that have been purchased, invoices that were due, and the actual vendor made an independent decision to transfer Mississippi Silicon's money to make a partial payment for invoice number 455. On October 27th, that's four days after receiving the email, Mr. Lally logged into Trustmark Bank's computer system and provided instructions for sending Mississippi Silicon's money on deposit there to a Bulgarian bank. And it was not just John Lally who made this decision and took these independent steps and affirmative actions, but also Patricia McPheeters, who herself had to log into Trustmark Bank's system and enter a second independent authorization code for the transfer to occur, and also Eddie Bordwine, president of Mississippi Silicon, who had to provide a verbal telephone authorization when he received a call from Trustmark Bank saying, Mr. Bordwine, do you intend to make this transfer? So, all three of those employees took affirmative steps that only they could take, and they were all required to take those in order and in concert to make that wire transfer. Thus, those three employees acted in successive steps to make that wire transfer happen in October. No transfer could have occurred without the actions of all three of those employees. Mr. Reed, it seems to be your view that the provision only applies to a nefarious outside hacker, and they alone sort of hack into the system and move the money around himself or herself. In sum, your honor, that is probably the way that construction would have to occur. This computer transfer fraud provision is made up of three interrelated chunks, if you will. Loss resulting directly from fraudulent entry of data into the Mississippi Silicon computer system that causes a transfer without the knowledge or consent of the insured. If there were an insider involved, in all likelihood, you would be looking at employee dishonesty. The way that this provision is written, I do believe that the overall understanding, the plain meaning of it is that there is being an unauthorized entry into this computer system, a criminal manipulation of the I mean, alternatively, I guess, you've got this resulting directly from clause. And I just wonder as a matter of sort of everyday kind of meaning, you read the language of that provision, and here the employees were tricked, they were defrauded. So why doesn't everything from that initial phony email to the eventual ultimate wire transfer, why doesn't all that directly result from the fraud? Because of the fully integrated nature of this provision, it is not just resulting directly from that has to occur, there has to be an actual entry of code or data that causes a transfer that's made by the Mississippi Silicon computer. And it all has to But you're saying the entry has to be made by someone on the outside. In all likelihood, Your Honor, at this point in time, I can't think of a situation where an insider process would fall strictly under computer transfer fraud. To my mind, it would trigger having to look at employee theft, employee dishonesty into the policy. So in all likelihood, because it needs to be an unauthorized entry of data, it needs to be a manipulation, an illegal manipulation of that computer system in order to force the transfer. So when this insurance claim came into access, access immediately recognized it under the social engineering fraud provision, and access is sent a check for the limit of insurance $100,000 Mississippi Silicon, the insured has rejected that payment twice. So Mississippi Silicon has actual insurance coverage for this particular loss, which resulted directly from the fact that a human employee was tricked into transferring Mississippi Silicon's money. We're here today because Mississippi Silicon does not want to accept the limit of insurance that applies for social engineering. It wants a larger limit. And so it has sought it and by looking to different agreements, below Mississippi Silicon argued under both funds transfer and computer transfer on appeal, we're focusing on computer transfer. So we turn back to that. And the simple fact is that if you read that as an integrated provision, a sentence made up of those three chunks that I discussed with the court, it doesn't apply to the facts here. Because what never occurred in this to transfer money without the knowledge of Mississippi Silicon's employees. And the entire part of that insuring agreement is that it must involve a computer transfer. It's a plain and unambiguous provision. And while we're talking about this issue about tricking the computer, again, I turn back to the facts of the record. There's no tricking the computer. So the record shows that the only fraudulent entry that Mississippi Silicon alleges is that it received an email. And to the earlier question, that is the only allegation in the case. So all of us receive emails all the time. There is no restriction that keeps an email from coming into us. That's what happened here. An email landed in an inbox at Mississippi Silicon. I think that it's a valid point to discuss whether that's a fraudulent entry. It was an entry of fraudulent information, but question whether that's an actual fraudulent entry. Now, when the email showed up, it had no functionality. It arrived in the system, and it sat there. A human had to choose to open it, had to choose to read it, and then had to choose to separately act on it. Email itself, from a computer forensic standpoint, had no malware or code that infiltrated this computer system and manipulated it. And so, in short, this email could not possibly cause, from a technical standpoint, the Mississippi Silicon computer system to do anything after it simply landed there and sat there. So the particular email could not make the computer system effectuate a transfer. The email itself that we're talking about here was an electronic request to a human being to convince that human being to separately go take action. So again, turning back to the chunks, loss resulting directly from fraudulent entry of data into the Mississippi Silicon computer system that causes a transfer without the knowledge or consent of the insurer. And to the earlier question, certainly without the knowledge or consent of the insurer directly modifies transfer. There are two prepositional phrases that follow that. They both modify transfer. And that set of facts is what did not occur. Now, the district court correctly determined that this integrated provision was clear and unambiguous. The court properly read all of its provisions together, and the court also considered it in the context of this policy as a whole, including with those other two crime provisions that I mentioned at the outset. And the court included a good and very thorough, very cogent discussion about the three chunks that I mentioned, resulting directly from. Judge Aycock jumped directly to Black's Law Dictionary to discuss the term in a straightforward manner, in a straight-liner course, immediately. And then she summarized that argument into the opinion, stating very specifically that if proximate cause or something else more expansive was intended, the language undoubtedly would have stated it. Turning to the computer transfer aspect, the court's analysis was the emails set in motion a series of events. The emails themselves did not manipulate the computer system and automatically transfer funds. The emails requested that Mississippi-Silicon engage in affirmative conduct. And finally, the employees, not the emails, initiated and authorized transfers. Next, without the knowledge of the insured, the court gave some special attention to that and stated it must be given meaning, it must be read in context of this sentence, and further stated its inclusion is telling and demonstrates that coverage applies for losses from transfers that occur without knowledge or consent. So the district court absolutely reviewed that provision together, holding that without knowledge or consent is a modifier of transfer. Finally, the court mentioned that the inclusion of the social engineering fraud provision provided guidance as well, because the court found that that provision authorized coverage when an employee relied upon information, later determined to be false. But considering the facts as a whole, Judge Aycock determined that there was no coverage under computer transfer fraud. Now, the court in that instance absolutely applied all the rules of construction that apply to an insurance contract under Mississippi law. And those are the same standards that will apply here. When a contract is clear and unambiguous, it must be interpreted exactly as it's written. A policy must be considered as a whole with all the relevant clauses together. And finally, it's necessary to read the full context of the insuring agreement, but also full context of that insuring agreement within the policy. Now, I do want to note for the court, we do have a very distinct set of language here in this computer transfer provision. The language before this court is more specific, more targeted, and more precise than the insuring coverage language that's been interpreted by other courts. And as a result, this language that is in the Mississippi Silicon policy really must be determined based upon its specifics. I am not aware of any other decision that's been issued that interprets this version of computer transfer fraud language. So therefore, there are no conflicting decisions to the district court's opinion. There are a myriad of decisions that have come out on all types of computer-related criminal activity, because obviously that is a very hot topic right now. And what I will say about the list of cases, I think there have been about a dozen now, is that you really must look at the facts and you really must look at the insuring provision. Because a number of the insuring provisions that have been interpreted are much broader, much more wide open than the one before the court today. Now, the Fifth Circuit has had an opportunity to look at whether an email fraud can constitute computer fraud in the context of a different insurance policy. Admittedly, the language there was broader than what is in the Mississippi Silicon policy, but that would make it more clear that the Mississippi Silicon policy does not cover computer transfer fraud here. So in that case, 2016, the Apache decision, the language that was before the court was loss resulting directly from use of any computer to fraudulently cause a transfer of property. The Fifth Circuit's decision was that to interpret the computer fraud provision as reaching any fraudulent scheme in which an email communication was part of a process would convert the computer fraud provision to one for general fraud. And the important aspects that the Fifth Circuit discussed in that decision included, number one, that receipt of an email cannot constitute computer fraud. The commentary on that was that the email was merely incidental to the occurrence of the later authorized transfer of direct means direct, with the commentary there being that the computer use was but one step in a multi-step and flawed process that ended in a transfer that was authorized by the insured. But in general, the holding was computer fraud coverage is not general fraud coverage. And importantly, the Fifth Circuit panel that looked at that case stated specifically that that was a plain meaning decision. So in that instance, the Fifth Circuit was looking at plain meaning of that particular policy. And the Fifth Circuit does not stand alone in concluding that an email does not constitute enough to be computer transfer fraud or computer fraud, depending on what type of policy that you're dealing with. You must look at the policy language and also, I'll just point out in general, if you are looking at the few cases that Mississippi Silicon has pointed out that I believe that are out of the mainstream of that about dozen cases that are decided, it is important to note that the cases that are mentioned by Mississippi Silicon never involve a social engineering social engineering insuring agreement. In other words, the only coverage in those matters that was potentially available would be computer fraud, because there was no social engineering insurance agreement. Therefore, those courts were looking for coverage when they did not have language as specific as what's in the access policy for computer transfer fraud, and they had no coverage at all for what's defined as social engineering fraud. We've cited in the brief, and I'll just refer to those generally, about other cases that of the Ninth Circuit in the Taylor and Lieberman case. In general, though, your honor, what those cases hold is that there must be a manipulation of the computer system that causes that transfer. I want to mention briefly the discussion about that word directly. What Mississippi Silicon is looking to do in this appeal is sort of pluck that word directly out of the middle of an ignore the contextual significance of that term, but we cannot look at the word directly alone. It has to be read in the middle of that integrated insuring agreement, and we cited for the court the numerous cases from around the country, including Fifth Circuit cases, discussing resulting directly from where the issue is that direct means direct. I will note that there is no Mississippi case that holds what Mississippi Silicon is asking the court to do. There's no Mississippi case on computer fraud language. There's no Mississippi case on a crime policy discussing loss resulting directly from. It seems to me that the cases that have been cited out of Mississippi are discussions about nearest efficient cause versus dominant cause, and that's not what's involved here. There's a single cause here, and that was there was a transfer by the human beings in Mississippi Silicon. There was no computer transfer, so we don't reach that. Additionally, the Fifth Circuit has noted in the Leonard case that nothing enshrines efficient proximate causation as an immutable rule of Mississippi insurance policy interpretation. There's quite a bit of discussion, your honors, in the cases. I'll have to commend those to the court on the briefing. We respectfully request the court to affirm and sustain the judgment that's been granted in favor of access. Thank you, your honor. Thank you, Miss Reed. Mr. Given, your rebuttal. Yes, first, your honors, I would like to say that Miss Reed in her remarks stated that there must be unauthorized access that causes the computer to directly transfer. She says a lot of things that are simply not in this definition in this phrase for computer transfer fraud. Had access elected to do that, they could have made the coverage read that way. There are many definitions in the policy that refer to the things that Miss Reed is talking about. There are such things as enterprise security event, extortion threat, which talk about the mechanics of somebody getting into the system, taking control, and forcing a transfer through these techniques. That simply is not in the definition that we have in this policy. Miss Reed also talks about the very precise language found in the access policy for computer transfer fraud coverage and acts like it's very restrictive, much more restrictive than the phrases, the definitions, in other cases that are in our briefs. But significantly, a lot of those cases not only say that a loss would be resulting directly from the act, but then they go on to say that directly causes. And that simply is not here. A simple, reasonable reading of this provision is that the deceitful entry of this information by the fraudsters into the Mississippi Silicon computer system caused Mississippi Silicon to send funds to the fraudsters to a fraudulent account without their knowledge and consent. And when you read it all together as written by access, that's a very reasonable and precise application to the facts in this case. One thing that we have not discussed is that this action was filed and approximately four later, access filed with the Department of Insurance in Mississippi a policy change regarding the very things we're talking about. We've pointed out in the brief that although ambiguity is to be construed by the court as a matter of law, their extrinsic evidence can become a consideration before an ambiguity has been identified from the face of the contract as a sense that such evidence can assist the court in determining whether as a matter of law, two plausible interpretations exist in the manner necessary to give rise to the existence of an ambiguity. We also cite from a case that says that basically the only logical explanation for the insistence by an insurer that the exclusionary endorsement be attached to a policy subsequently is that without it, the law suffered by the plaintiff fell within the original policy. This policy change very clearly states, it's called the amend exclusions for social engineering fraud coverage endorsement, states that none of the coverages under this policy other than the employee theft coverages and social engineering fraud coverage apply to laws that is covered under the social engineering fraud coverage or to laws that is not covered under the social engineering fraud coverage because either the amount of the loss exceeds the social engineering fraud coverage limit of insurance or the coverage was not purchased. This very endorsement would rectify what the reasonable interpretation of Mississippi Silicon to the computer fraud transfer provision and should have been considered by the trial court in determining whether or not Mississippi Silicon's reading and interpretation of the computer transfer fraud provision was reasonable and very significant. We were not allowed to do any discovery or to find out more about that at the trial court level as is outlined in the briefs. So in short, we believe that our reading is reasonable and when you have two reasonable interpretations, there's an ambiguity court should find in Mississippi Silicon's favor or at a minimum reverse to have the trial judge consider it under the proper causation standard. All right, thank you. Both sides, we have the case and you may be excused from the Zoom.